# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION

| | |
|---|---|
| BRAXTON HOLDER AND EDWARD L. WEAVER, Derivatively On Behalf of ADVANCE AUTO PARTS, INC.,<br><br>Plaintiffs,<br><br>vs.<br><br>CARLA J. BAILO, JOHN F. FERRARO, JOAN M. HILSON, JEFFREY J. JONES II, EUGENE I. LEE, JR., DOUGLAS A. PERTZ, SHERICE R. TORRES, ARTHUR L. VALDEZ JR., NIGEL TRAVIS, THOMAS R. GRECO, JEFFREY W. SHEPHERD, AND WILLIAM J. PELLICCIOTTI, JR.,<br><br>Defendants,<br><br>-and-<br><br>ADVANCE AUTO PARTS, INC.,<br><br>Nominal Defendant. | Case No.:<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**JURY DEMANDED** |

Plaintiffs Braxton Holder and Edward L. Weaver ("Plaintiffs"), by and through undersigned counsel, derivatively on behalf of Nominal Defendant Advance Auto Parts, Inc. ("Advance Auto Parts" or the "Company"), submit this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiffs' allegations are based upon their personal knowledge as to themselves and their own acts, and upon information and belief, developed from the investigation and analysis by Plaintiffs' counsel, including a review of publicly available information, including filings by Advance Auto Parts with the U.S. Securities and Exchange

Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Advance Auto Parts directors and officers from November 16, 2022 through to May 31, 2023 (the "Relevant Period"), which caused substantial damage to the Company.

2.      Headquartered in Raleigh, Advance Auto Parts is a retailer specializing in automobile parts and accessories, serving both professional and non-professional customers. In 2001, the Company went public on the New York Stock Exchange and has since rapidly expanded, becoming the largest automotive aftermarket parts provider in North America.

3.      Throughout the Relevant Period, the Individual Defendants (defined below) made false and/or misleading statements and/or failed to disclose material facts because they: (i) misrepresented the efficacy of Advance Auto Parts' strategic pricing initiative and the impact of price reductions; (ii) omitted and/or concealed the negative impacts of the pricing initiative; (iii) provided investors with an overly optimistic perception of Advance Auto Parts' operations; and (iv) created the false impression that inflation and macroeconomic factors had an insubstantial impact on the Company's margins.

4.      On May 31, 2023, the Company's Chief Executive Officer ("CEO"), Defendant Greco (defined below), disclosed that the Company's "financial results in the first quarter were well below expectations" and that because Advance Auto Parts lowered prices on products, it "had less price realization than plan[ned], which put substantially higher pressure on our product margin

rate." Additionally, the Company's Chief Financial Officer ("CFO"), Defendant Shepherd (defined below), revealed that the Company's strategic pricing program resulted in the Company being "unable to price to cover product costs in the quarter." As a result, the Company revised downward its 2023 guidance.

5. Following this, the Company's share price suffered a single-session decline of approximately 35% on unusually high trading volume.

## JURISDICTION AND VENUE

6. This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 as the claims asserted herein arise under Sections 10(b), 21D, and 14(a) of the Securities Exchange Act of 1934 ("Exchange Act").

7. This Court also has jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

8. Venue is proper in this Court in accordance with 28 U.S.C. § 1391 because: (i) the Company maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to the Company, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

9. In connection with the acts, transactions, and conduct alleged herein, the Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a

national securities exchange.

**PARTIES**

**Plaintiffs**

10.     ***Plaintiff Braxton Holder*** ("Holder") acquired the Company securities on December 30, 2022 and will continue to hold Advance Auto Parts shares throughout the pendency of this action.  Plaintiff Holder will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

11.     ***Plaintiff Edward L. Weaver*** ("Weaver") acquired the Company securities on January 9, 2023 and will continue to hold Advance Auto Parts shares throughout the pendency of this action.  Plaintiff Weaver will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

**Nominal Defendant**

12.     ***Nominal Defendant Advance Auto Parts*** is a Delaware corporation with its principal executive offices located at 4200 Six Forks Road, Raleigh, North Carolina 27609. The Company's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "AAP."

**Director Defendants**

13.     ***Defendant Carla J. Bailo*** ("Bailo") has served as a Company director since August 2020. Defendant Bailo is a member of the Company's Audit Committee and Nominating and Corporate Governance Committee ("N&G Committee").

14.     ***Defendant John F. Ferraro*** ("Ferraro") has served as a Company director since February 2015. Defendant Ferraro is the Chair of the Company's Audit Committee and is designated as a financial expert.

4

15. **Defendant Joan Hilson** ("Hilson") has served as a Company director since March 2022. Defendant Hilson is the Chair of the Company's Finance Committee and a member of the Audit Committee.

16. **Defendant Jeffrey J. Jones II** ("Jones") has served as a Company director since February 2019. Defendant Jones is the Chair of the Company's Compensation Committee and a member of the N&G Committee.

17. **Defendant Eugene I. Lee, Jr.** ("Lee") has served as a Company director since November 2015 and is also currently Chairman of the Board. Defendant Lee is a member of the Company's Finance Committee.

18. **Defendant Douglas A. Pertz** ("Pertz") has served as a Company director since May 2018. Defendant Pertz is the Chair of the Company's N&G Committee and a member of the Compensation Committee.

19. **Defendant Sherice R. Torres** ("Torres") has served as a Company director since September 2021. Defendant Torres is a member of the Company's Compensation Committee.

20. **Defendant Arthur L. Valdez, Jr.** ("Valdez") has served as a Company director since August 2020. Defendant Valdez serves as a member of the Company's Audit Committee and Finance Committee.

**Former Director Defendants**

21. **Defendant Nigel Travis** ("Travis") served as a Company director from August 2018 through to May 2023. During his tenure, Defendant Travis served as Chair of the Company's N&G Committee and as a member of the Compensation Committee.

22. The above-named defendants at ¶¶ 13-20 are collectively referred to herein as the "Director Defendants."

**Former Officer Defendants**

23.     **Defendant Thomas R. Greco** ("Greco") was the Company's President and CEO from August 2016 through to his retirement in February 2023. Defendant Greco was also a Company director from April 2016 through to February 2023.

24.     **Defendant Jeffrey W. Shepherd** ("Shepherd") was the Company's Executive Vice President and Chief Financial Officer ("CFO") from 2018 through to August 2023, having served as the Company's Senior Vice President, Controller and Chief Accounting Officer from 2017 through 2018.

25.     **Defendant William J. Pellicciotti, Jr.** ("Pellicciotti") was the Company's Senior Vice President, Controller, and Chief Accounting Officer ("COO") from January 2022 through to his resignation on October 18, 2023.

26.     The above-named defendants at ¶¶ 23-25 are collectively referred to herein as the "Officer Defendants."

27.     The Director Defendants along with the Officer Defendants are referred to herein as the "Individual Defendants."

**Non-Parties**

28.     **Non-Party Shane O'Kelly** ("O'Kelly") is the Company's President, CEO, and a director, having held these roles since September 2023.  Non-Party O'Kelly is named herein for demand futility purposes.

29.     The above-named defendants at ¶¶ 13-20 along with Non-Party O'Kelly are referred to herein as the "Current Directors."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

30.     By reason of their positions as officers, directors, and/or fiduciaries of Advance

6

Auto Parts and because of their ability to control the business and corporate affairs of Advance Auto Parts, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders.

31.    Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, financial condition, and present and future business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

32.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with the Company, each of the Defendants had access to adverse non-public information about the financial condition, operations, sales and marketing practices, and improper representations of the Company.

33.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and

controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)     Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     Conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     Properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     Remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)     Ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)     Ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

34.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

35.    The Individual Defendants breached their duties of loyalty and good faith by causing the Company to misrepresent the information as detailed *infra*.  The Individual Defendants subjected the Company to the costs of defending, and the potential liability from, the two securities class actions entitled *Suarez v. Advance Auto Parts, Inc., et al.*, Case No. 5:23-cv-563 (E.D.N.C.) (the "Suarez Class Action") and *Watson v. Advance Auto Parts, Inc., et al.*, Case No. 5:23-cv-611 (E.D.N.C) (the "Watson Class Action") (together, the "Securities Class Actions").  As a result, the Company has expended, and will continue to expend, significant sums of money.

36.    The Individual Defendants' actions have irreparably damaged the Company's corporate image and goodwill.

### THE COMPANY'S CORPORATE GOVERNANCE

37.    At all relevant times, the Company had in place extensive corporate governance documents imposing duties and responsibilities on its directors and officers, and additional duties on the Company's committee members. Accordingly, each of the Individual Defendants were required to comply with the corporate governance documents, as detailed below.

38.    Despite the following corporate governance, the conduct of the Individual

Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Advance Auto Parts, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Individual Defendants were aware posed a risk of serious injury to the Company.

**Code of Ethics and Business Conduct**

39.     At all relevant times, the Company had in place its Code of Ethics and Business Conduct ("Code of Conduct") which applied to "[a]ll employees and officers of Advance," "[a]ll members of the Advance Board of Directors," and "[a]ny parties who conduct business with or on behalf of Advance."

40.     The Code of Conduct in place during the Relevant Period provided "information and guidance on our commitment to being honest and ethical in all of our business dealings." Accordingly, the Code of Conduct states that "we expect and require all of our Team Members, including our officers and directors, and any parties with whom we do business to conduct themselves in accordance with the highest ethical standards."

41.     The Code of Conduct in place during the Relevant Period sets forth the following "Key Principles of Our Code," in relevant part:

[] Honesty

We must be honest and truthful in all of our dealings and relationships with our customers, our vendors, our stockholders, our fellow Team Members and any other person or entity with whom we come into contact.

[] Fair Dealing

We must be fair and professional in all of our business dealings, including our dealings with our customers, our vendors and suppliers, our fellow Team Members and our competitors. We must never take advantage of anyone we do business with through manipulation, concealment, misuse of confidential information, giving or accepting bribes or kickbacks, antitrust violations, misrepresentation of material facts or any other unfair or dishonest business practice.

[] <u>Compliance with Laws</u>

We must comply with all federal, state and local laws and regulations that apply to our business, including insider trading laws. If there is any uncertainty about what is required by the law or our company policies, further guidance should be sought without delay.

[] <u>Accurate Company Records and Public Disclosures</u>

All company information and records, financial or otherwise, and all company disclosures and public communications must accurately reflect transactions and events, be consistently applied, and conform to both required accounting and reporting principles and Advance Auto Parts' systems of internal controls and policies.

[] <u>Protection of Company Assets</u>

We must protect the assets of the company from loss, theft, damage, carelessness and waste. Company assets and property may only be used for legitimate business purposes and with proper authorization and notice.

42.     In addition, in a section entitled "Reporting Code of Ethics Violations," the Code

states:

The Company has developed and communicated reporting procedures and systems to encourage all Team Members, officers, directors and other interested parties to ask questions about the Code or to report a violation. These systems include:

• Chain of command reporting options described in our Team Member Handbook;
• Contacting the appropriate Human Resources and/or Asset Protection partner; and/or
• Contacting the Advance Auto Parts Team Member Hotline by telephone (1-800-277-2900) or online (www.ethicspoint.com). The anonymity of callers using the Team Member hotline will be respected.

43.     The Code of Conduct goes on to provide that "Advance Auto Parts will promptly

and thoroughly investigate all complaints of Code violations. Violations of the Code by Team

Members, officers or directors will result in discipline, up to and including termination of

employment or removal from office.  Violations of this Code by vendors, suppliers or other outside

parties may result in termination of their relationship(s) with Advance Auto Parts. If applicable,

11

the Company may also pursue civil or criminal prosecution."

**Code of Ethics for Financial Professionals**

44.     During the Relevant Period, the Company had in place its Code of Ethics for Finance Professionals to "promote and provide for the ethical conduct by Advance's finance professionals, as well as for full, fair and accurate financial management and reporting." The Code of Ethics for Finance Professionals applied to the "principal executive officer, principal financial officer, principal accounting officer or controller and any other person performing similar functions." Accordingly, Defendants Greco, Shepherd and Pellicciotti, at the very least, were bound by this Code of Ethics for Finance Professionals.

45.     The Code of Conduct for Finance Professionals set forth the following provisions that the "finance professionals" each agreed to, in relevant part:

[] Engage in and promote honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships.

[] Produce full, fair, accurate, timely and understandable disclosure in reports and documents that Advance or its subsidiaries files with, or submits to, the Securities and Exchange Commission and any other regulator and in other public communications made by Advance or its subsidiaries.

[] Comply with all laws, rules and regulations of federal, state and local government, as well as any applicable rules and regulations of any applicable self-regulatory organizations, such as the New York Stock Exchange.

[] Promptly report any known or suspected violation of this Code of Ethics to the General Counsel or to the Chair of the Audit Committee.

[] Avoid taking any action to fraudulently influence, coerce, manipulate or mislead any independent public auditor of Advance or its subsidiaries for the purpose of rendering the financial statements of Advance or its subsidiaries misleading.

**Audit Committee Charter**

46.     At all relevant times, the Company had in place its Audit Committee Charter which

set forth the additional duties and responsibilities of the Audit Committee members – consisting of Defendants Bailo, Ferraro, Hilson, and Valdez through the Relevant Period and at present.

47.     The Audit Committee Charter provides that the members of the Audit Committee are to "assist the Board in monitoring (1) the integrity of the financial statements, reporting processes and internal controls of the Company and its subsidiaries, (2) the performance of the Company's internal audit function and independent auditors, (3) the qualifications and independence of the Company's independent auditor and (4) the compliance by the Company and its subsidiaries with legal and regulatory requirements.  In addition, the Committee is responsible for preparing the Audit Committee report required by the Securities and Exchange Commission's ("SEC") proxy rules for inclusion in the Company's annual proxy statement."

48.     Moreover, the Audit Committee Charter sets forth these specific oversight duties, in relevant part:

The Committee will:

[] Assist the Board to ensure that management properly develops and adheres to a sound system of internal controls and that procedures are in place to objectively assess management's practices and internal controls, and discuss with the independent auditor the matters required to be discussed under applicable Public Company Accounting Oversight Board and accounting and auditing standards.

[] Review with management and the independent auditors the effectiveness of the Company's accounting and auditing principles and practices, disclosure controls and procedures and internal controls.

[] Review, and make regular reports to the Board addressing, the quality and integrity of the Company's financial statements, reporting processes, internal controls, accounting principles, regulatory compliance, the performance and independence of the independent auditors, and the performance of the Company's internal audit function.

[] Ensure that before filing financial statements with the SEC the independent auditor reports to the Committee, the Company's CEO and CFO: (a) all critical accounting policies and practices used by the Company, (b) all alternative accounting treatments of financial information within generally accepted

accounting principles ("GAAP") that have been discussed with management, including the ramifications of the use of such alternative treatments and disclosures and the treatment preferred by the independent auditor, and (c) other material written communications between the independent auditor and management.

[] Review the Company's quarterly and annual financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations." The Committee will recommend to the Board whether the audited financial statements should be included in the Company's annual report.

[] Review the reports of the CEO and CFO (in connection with their required certifications) regarding any significant deficiencies or material weaknesses in the design or operation of internal controls, and any fraud that involves management or other employees who have a significant role in the Company's internal controls.

[] Discuss earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies.

[] Annually review the guidelines and policies with respect to the Code of Ethics for Finance Professionals. Review and discuss with the General Counsel, or the General Counsel's designee, known or suspected violations of the Code. Take action as deemed appropriate for violations of the Code.

## **BACKGROUND**

49. The Company is a retailer specializing in aftermarket automobile parts and accessories, serving both automobile professionals and non-professional consumers. The Company operates stores called "Advanced Auto Parts," "Autopart International," "Carquest," and "Worldpac." Advance Auto Parts operates over 4,700 stores (across all four brands) in the United States and Canada.

50. After becoming a publicly traded company in 2001, Advance Auto Parts rapidly expanded, primarily through acquisitions, becoming the largest automotive aftermarket parts provider in North America by 2016.

## THE FALSE AND MISLEADING STATEMENTS

**November 2022**

51. On November 16, 2022, the Company held an earnings conference call for the third quarter of 2022. During this conference call, certain of the Individual Defendants discussed Advance Auto Parts' "strategic pricing initiatives" which were designed to propel margin growth in 2023.

52. During the portion of the conference call, Defendant Greco stated:

From our analysis, two opportunities came to the forefront, particularly in the professional sales channel. First, we have opportunities on availability in certain categories, which require inventory investment to enable us to get more SKUs closer to the customer. Secondarily, ***while our research has consistently indicated that price is not the most important driver of choice for professional customers, we've tested and will make surgical pricing actions in certain categories to enable us to better address changes in competitive pricing dynamics***.

\* \* \*

As you know, 2023 will be the final year of a three-year strategic plan we outlined in April '21 that focused on growing at or above market, expanding margins and returning excess cash to shareholders.

We established three-year performance ranges for several financial metrics and an overarching goal of delivering top quartile total shareholder return. We achieved that TSR goal for 2021 and continue to believe that we will achieve the majority of the three-year goals outlined. ***In terms of adjusted operating income margin rate, we've delivered significant margin expansion since the start of 2021. We're also executing strategic initiatives to enable further margin expansion***.

\* \* \*

… In addition, growing owned brands and i***mplementing strategic pricing actions to cover cost increases are key enablers of margin expansion***. Our new strategic pricing capabilities also enable us to respond with targeted and precise actions. This means we can both eliminate unprofitable discounts to improve gross margin rate and, at the same time, make calculated investments elsewhere to drive sales.

\* \* \*

In summary, while this was a difficult quarter for Advance, Comp sales and adjusted operating income margins were generally in line with our expectations. And **based on our updated guidance, we'll deliver the second consecutive year of net sales growth and adjusted operating margin expansion**.

(Emphasis added).

53.    Then, during the question-and-answer portion of the conference call, the following exchange ensued:

**Simeon Gutman – Morgan Stanley:**

I wanted to ask about pricing. You made the business healthier over the last few years because you've taken out these price match overrides. And I think it sounds like you've been more disciplined in general. So can you talk about pricing? Your peers have obviously engaged in some discounting. You haven't used that lever. And I know you're, I guess, attacking the problem with inventory. But curious how you think about price versus assortment or depth of inventory.

**Defendant Greco:**

Simeon, so our analysis suggests that the majority of the underperformance in Pro is driven by availability and inventory positioning. So you're right on interpreting that. It's — **availability is the #1 driver of choice for the professional installers. And as we said many times, price is much lower down the list**. So in general, we are continuing to execute our category management strategy and much of that remains the same. So we are going to remain very disciplined in how we price in the marketplace. We have so much more in terms of sophisticated tools to manage pricing than we did when all of us arrived here a few years ago. So I feel really good about where we're positioned there. The new capabilities allow us to price by region, by market, by channel, by store.

So we're still focused on removing unprofitable discounts in really in all channels. So that doesn't change. **I think what is new is we successfully tested some surgical pricing actions in some of the more challenged categories, and we're going to essentially continue to do that and expand that more broadly. Our goal overall is to price to cover cost increases. However, we're going to make some investments in key categories where we expect to drive incremental top line growth**.

(Emphasis added).

54.    Also, during the call, the following exchange took place between a Wedbush Securities analyst and Defendant Greco:

**Seth Basham – Wedbush Securities:**

Tom, maybe you could just provide a little bit more perspective on what changed in terms of the competitive environment to drive these inventory and price investment decisions here. Was there a significant change in the third quarter? And then relatedly, do you expect the competitive reaction to these moves?

**Defendant Greco:**

Well, first of all, we were executing our strategy, as you know, Seth, and — which is a different strategy than our peers. I think, obviously, the inventory investments that have been made inside the industry and the widely documented pricing investments were out there. And as it started to have a greater impact on us, I think that's when we had to respond. And we're responding with primarily targeted inventory investments. That's the biggest one. That's where we really are focused here because we believe that's the most important thing, getting the right part in the right place at the right time. So we will take those actions, and we think that's going to have a big impact on improving our growth in 2023. ***The pricing piece, because of our tools, we're able to respond surgically***.

***It's not as important to our customers as the availability is. So we're going to be very thoughtful and disciplined about that pricing piece***. ***But we are going to take some actions to respond to that***. In terms of competitive response, we'll see what happens there. But we're optimistic that the inventory investment that we're making will accelerate our performance in these key categories, which has really been a drag on us over the course of the year.

(Emphasis added).

55.    Finally, during the call, the following exchange ensued between a BNP Paribas

analyst and Defendant Greco:

**Chris Bottiglieri – BNP Paribas:**

And then a follow-up question on kind of price investments. It seems like your peers have taken price investments. I think both have lower Pro mix than you do. And it seems like the gross margin headwinds, at least for one of them, seem to be somewhere in the 75 basis point to 100 basis point headwind rate. How do you think about the level of price investment and margin reinvestment you need to make comparable price investments? Are there certain categories where you feel like you're further behind and you don't need quite as much of a price investment? Like how do you just frame the size of this investment?

**Defendant Greco:**

Good question, Chris. I mean, *we use the word surgical for a reason. The tools that we've built and the team that we have to manage pricing is at the highest level we've ever had in this company. And we are very confident that we can make decisions here that are right for the business*. And that includes removing unnecessary discounts where it makes sense, redeploying resources to our highest growth and largest strategic customers and then, at the same time, making surgical price investments in very specific categories and even in the case of stores. So the analysis we've done has been very granular. And we know where we need to make those price investments. *Our overall goal continues to be priced to cover margin rate*.

That is the goal. Obviously, the competitive environment plays a role in how that will unfold next year, and *we intend to be very thoughtful about how we price relatively speaking. But it remains — our goal remains price to cover rate, and we'll see how that unfolds*.

(Emphasis added).

56.     Despite knowing that "availability is the #1 driver of choice for the professional installers" and that "price is much lower down the list," the Individual Defendants continued to cause and/or permit the Company to initiate the "strategic pricing initiatives," and also concealed how reducing the price of goods would serve to cover the above-mentioned cost increases.

57.     Earlier that same day, the Company also filed its Quarterly Report on Form 10-Q with the SEC for the third quarter of 2022 ("3Q22 10-Q"). The 3Q22 10-Q was signed by Defendant Pellicciotti and contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Greco and Shepherd. The 3Q22 10-Q touted the Company's strategic pricing, stating in relevant part:

A high-level summary of our financial results for the third quarter of 2022 includes:

[] Net sales during the third quarter of 2022 was $2.64 billion, an increase of 0.8% compared with the third quarter of 2021, driven by *improvements in strategic pricing* and growth in new store openings. […]

*       *       *

We continue to make progress on the various elements of our strategic business plan, which is focused on improving the customer experience, margin expansion

18

and driving consistent execution for both professional and DIY customers. To achieve these improvements, we have undertaken planned strategic initiatives to help build a foundation for long-term success across the organization …

(Emphasis added).

## February 2023

58.     On February 28, 2023, the Company issued a press release announcing its financial results for the fourth quarter and full year 2022. The press release contained the following:

"In 2022, our team members once again worked to serve our customers with relentless focus and dedication. Despite challenges throughout 2022, we made progress on our strategic initiatives, including the expansion of our footprint, further strengthening of our DieHard® brand and improved customer loyalty," said Tom Greco, president and chief executive officer. "However, *we are not satisfied with our results in 2022 and are taking decisive actions to improve performance in 2023. Importantly, the disciplined inventory and pricing actions we discussed last quarter to adapt to an evolving competitive landscape contributed to stronger results in Q4 and we ended the year with positive momentum*.

(Emphasis added).

59.     That same day, the Company filed its Annual Report on Form 10-K with the SEC for the 2022 fiscal year ("2022 10-K"). The 2022 10-K was signed by Defendants Greco, Shepherd, Pellicciotti, Lee, Bailo, Ferraro, Hilson, Jones, Pertz, Torres, Travis, and Valdez. The 2022 10-K also contained SOX certifications signed by Defendants Greco and Shepherd.

60.     The 2022 10-K contained the following information, in relevant part:

We continue to make progress on the various elements of our strategic business plan, which is focused on improving the customer experience and driving consistent execution for both professional and DIY customers. To achieve these improvements, we have undertaken planned strategic initiatives to help build a foundation for long-term success across the organization […].

61.     While touting the "strategic business plan" and "strategic initiatives," the 2022 10-K remained silent on the negative impacts of the Company's strategic pricing initiative, how reducing the price of goods would serve to cover costs, and thus provided investors with an overly

optimistic perception of Advance Auto Parts' operations.

62.     Also, on February 28, 2023, the Company held an earnings conference call for the fourth quarter of 2022.  During this, certain of the Individual Defendants discussed Advance Auto Parts' strategic pricing program and its performance.

63.     In particular, Defendant Greco indicated that "the decisive actions we took in the latter half of the year led to improved performance in Q4, and we expect that to continue into 2023."  Defendant Greco further stated: "We continue to execute the disciplined inventory and pricing actions we discussed last quarter. These actions contributed to stronger results and we expect to improve parts availability throughout 2023, which we believe is the single most important driver to accelerate top line growth."

64.     During the scripted portion of the call, Defendant Greco further discussed the "surgical price investments," asserting in relevant part:

> Last quarter, we also talked about plans to leverage new capabilities to make surgical price investments. Through detailed reviews of our performance, we've made targeted investments and we'll closely monitor and adjust pricing as needed given industry dynamics.

65.     Defendant Greco then concluded his opening remarks, downplaying the "macroeconomic backdrop" while painting an optimistic picture of 2023 and the Company's "strategic" investments, stating:

> As we begin the year, we remain cautious surrounding the macroeconomic backdrop, including the potential for ongoing pressure on low to middle income consumers. ***However, our 2023 guidance is underpinned by continued industry strength with the drivers of demand remaining positive. Further, we expect the strategic inventory investments we began in the second half of 2022 will help drive growth in 2023. In terms of our expectations for the year, we're guiding to growth in net and comp sales, as well as GAAP operating income margin expansion***.

(Emphasis added).

66.     Defendant Shepherd, during the scripted portion of the call, also downplayed the

macroeconomic factors and provided a positive outlook of 2023, stating:

> ***Our 2023 guide is underpinned by a cautious macroeconomic outlook given the pressure on low and middle income consumers. Balanced with the continued industry strength as the primary driver's demand remain positive***. In 2023, we expect product cost inflation of mid-single digits overall, with moderation throughout the year. From a phasing standpoint, we expect Q1 2023 to be the most challenging quarter of the year for three reasons. First, based on GAAP accounting, we expect higher product costs year-over-year in Q1 than in subsequent quarters. Second, we expect to build sales momentum throughout the year as we improve availability. Third, we expect higher transformation costs within SG&A in Q1. ***Given these factors, we expect to experience stronger growth and margin expansion post Q1***.

(Emphasis added).

67.     Then, Defendant Shepherd provided the Company's 2023 guidance:

> … our guidance includes net sales of ***$11.4 billion to $11.6 billion***. Comparable store sales of 1% to 3%, ***GAAP operating income margin of 7.8% to 8.2%***, income tax rate of 24% to 25%, diluted earnings per share of $10.20 to $11.20, capital expenditures of $300 million to $350 million, a minimum of $400 million in free cash flow and 60 to 80 new store and branch openings. With last year's investment in inventory resulting in higher payable payments this year and anticipated continued inventory investments, we've temporarily paused share repurchases under our existing program. And at this time, we're not guiding a range of repurchases for the full year. Importantly, we remain committed to paying quarterly cash dividends.

(Emphasis added).

68.     During the question-and-answer portion of the call, the following exchange ensued

between a JPMorgan Chase analyst and Defendant Shepherd:

**Christian Carlino – JPMorgan Chase:**

> … And then on the margin guidance, could you help us understand the complexion of gross margin versus SG&A outlook? And more specifically, do you still expect the capitalized cost headwinds to primarily hit in the first half? Or should continued inflation drag that out into the second half potentially?

**Defendant Shepherd:**

Yeah, I'll take the second part of that question first. ***In terms of inflation, particularly product inflation, we do think it's going to be more of a first half versus a second half, so that's the way we've sort of modeled it here internally***. We haven't broken out the contribution of gross margin and SG&A, specifically for the year in terms of the 140 to 180 basis point expansion, but we do believe that we'll get margin contribution from both gross margin and SG&A. Overall, we think gross margin will likely contribute more, but we're laser-focused on both growing our gross margin while controlling our cost base.

(Emphasis added).

69.     Then, following a question from a Jefferies analyst regarding "Pro performance" and the "major impact" on "underperforming versus peers," Defendant Greco provided the following:

… [w]e talked about surgical price investments to close the competitive gap, and we've made a lot of progress there.  We monitor that every week.  It's done really account-by-account and category-by-category.  But the actions we're taking are enabling us to drive more top line sales in Pro and still show margin expansion.

70.     In response to an analyst question from MKM Partners regarding "top line acceleration" and whether the Company is "seeing the payback from [the] inventory investments," Defendant Greco stated:

We didn't get a lot of benefit on the Pro side in the fourth quarter from the investments. We're going to do that in a very disciplined fashion.  ***We've got a very robust plan to drive growth in Pro, and we want to do it the right way.  And it's done, as I say, very targeted inventory investments, very surgical price investments***. And we're confident that, that will drive growth in Pro as the year unfolds, but we didn't see a lot of benefit from that in the fourth quarter.

(Emphasis added).

71.     Also, during the call, the following exchange took place between a Truist analyst and Defendant Shepherd:

**Scot Ciccarelli – Truist:**

… So how should we be thinking about the pricing investments that you guys mentioned last quarter relative to, let's call it, the price optimization efforts you implemented over the last few years. Like how are we supposed to kind of

reconcile, if you will, kind of the price investment versus, let's call it, raising prices over the last couple of years, which I think has been a pretty big gross margin driver.

**Defendant Shepherd:**

Yeah. So a couple of things there. We talked about the unprofitable discounts. We've worked through the vast majority of that. That's going to be an ongoing process. It's really something that doesn't go away. It did not have a significant impact in the fourth quarter. In fact, we saw a very slight benefit, meaning that we didn't lose those customers, and we were still getting the sales and the – an improved margin because we weren't giving it away through an unprofitable discount. More broadly, in terms of the competitive set, Tom mentioned this earlier, but *we're going to be very surgical in the pricing investments that we made to close the competitive gap and we use the word surgical for a reason*. We look at CPI and peak last summer, and as we were into the fourth quarter, we're back to where we want to be.

And we're testing in different markets. We're monitoring this on a daily and a weekly basis, and we're clearly seeing results. *So we're going to make sure we're competitive. We're not going to lose on price, and we're going to improve our availability. And we think that sets us up for a very strong year*.

(Emphasis added).

## April 2023

72.    On April 7, 2023, the Company filed its Annual Report to Shareholders on Form ARS with the SEC, attaching the Company's previously filed 2022 10-K.  In a letter to shareholders at the start of the Annual Report, Defendant Greco wrote, in pertinent part:

We were not satisfied with our relative Topline performance versus the industry last year, and we took measured deliberate actions to address this and accelerate growth. First, we're making strategic inventory investments to improve availability, working closely with our vendors to ensure we get the right part to the right place at the right time. Second, *we're making surgical pricing investments in certain categories to enable us to better address changes in competitive pricing dynamics*.

(Emphasis added).

73.    Also on April 7, 2023, the Company filed its Proxy Statement for 2023 on Schedule 14A with the SEC, solicited by Defendants Bailo, Ferraro, Greco, Hilson, Jones, Lee, Pertz, Torres, Valdez, and Travis (the "2023 Proxy Statement").  The 2023 Proxy Statement solicited the

approval of, *inter alia*: (i) the re-election of Defendants Bailo, Ferraro, Greco, Hilson, Jones, Lee, Pertz, Torres, and Valdez to the Board; (ii) the Company's 2023 Omnibus Incentive Compensation Plan; (iii) the Company's 2023 Employee Stock Purchase Plan; and (iv) the compensation of the Company's executive officers.

74.　　The 2023 Proxy Statement, in justifying Defendant Greco's proposed salary increase, touted Defendant Greco's "[s]trong multi-year performance, including development and execution of a new strategic plan."  The 2023 Proxy Statement further touted the Company's "strong" "strategic and financial performance." However, the 2023 Proxy Statement failed to disclose and/or concealed the negative impacts of the Company's strategic pricing initiative and provided investors with an overly optimistic perception of Advance Auto Parts' operations.  Had the Company's shareholders known of these adverse material facts then they would not have approved the solicited proposals.

75.　　The above-referenced statements were materially false and/or misleading and/or failed to disclose material adverse facts about the Company's business, operations, and finances. Specifically, Defendants made false and/or misleading statements and/or failed to disclose material facts in that they: (i) misrepresented the efficacy of Advance Auto Parts' strategic pricing initiative and the impact of price reductions; (ii) omitted and/or concealed the negative impacts of the pricing initiative; (iii) provided investors with an overly optimistic perception of Advance Auto Parts' operations; and (iv) created the false impression that inflation and macroeconomic factors had an insubstantial impact on the Company's margins.  As a result of the foregoing, the above statements were false and misleading at all material times.

**THE TRUTH EMERGES**

76.　　On May 31, 2023, the Company issued a press release, attached as Exhibit 99.1 to

a Current Report filed on Form 8-K with the SEC. In the press release, Defendant Greco stated:

> […] While we anticipated the first quarter would be challenging, our results were below our expectations. Net sales grew 1.3% in the quarter. Our operating margin rate of 2.6% in the quarter was well below expectations due to higher than planned investments to narrow competitive price gaps in the professional sales channel as well as unfavorable product mix.

> […] We have reduced our full-year guidance and our board of directors made the difficult decision to reduce our quarterly dividend.

77. That same day, the Company held an earnings conference call for the first quarter of 2023. During the scripted portion of the call, Defendant Greco stated that "our financial results in the first quarter were well below expectations" and that "in order to sustain our targeted competitive price position in Q1, we had less price realization in implant, which put substantially higher pressure on our product margin rate. Our gross margin rate declined 162 basis points, with the single biggest shortfall versus expectations being less than planned price realization within product margin."

78. Defendant Shepherd, also during the scripted portion of the call, stated:

> In terms of gross margin, we experienced headwinds associated with targeted price investments, which were above expectations due to the current competitive landscape. It's important to point out that as we remain committed to maintaining the competitive price targets we've established and have now attained in key categories, we were unable to price to cover product costs in the quarter.

79. Defendant Shepherd then provided reduced guidance for 2023, stating:

> Given the factors discussed, we are updating our full year guide to include net sales of ***$11.2 billion to $11.3 billion***, comparable store sales of negative 1% to flat, ***GAAP operating income margin of 5% to 5.3%***, income tax rate of 24% to 25%, diluted earnings per share of $6 to $6.50, capital expenditures of $250 million to $300 million, a range of $200 million to $300 million in free cash flow and 40 to 60 new store and branch openings.

(Emphasis added).

80. During the question-and-answer portion of the call, the following exchange took

place:

**Christopher Horvers – JPMorgan:**

[…] So as you think about price and availability, is -- are you -- have the price investments been made and now we're sort of annualizing through that? And is there any LIFO dynamic there? Then on the availability side, you did add a lot of inventory. So is availability where you want it? Or are we also trying to figure out, right? We have the inventory, but is there a question of it's just not in the right location.

**Defendant Greco:**

Sure. Well, first of all, on the – I'll start with availability because Jeff can connect price a little bit after I talk, but we're always going to want to have improved availability. We are making good progress there. Our on-hand rates are up, our supplier fill rates are up, our fill rates from the DCs to the stores are up, so good progress on availability in terms of our on-hand rates, still room to improve there, but clearly, we're improving there.

In terms of price, as I said with the earlier question, *we have a targeted price index versus the industry by category. And to answer your question directly, we are where we need to be there. It is resulting in less price realization than we planned, but we are at the targeted index now*.

(Emphasis added).

81.     Then, in response to a question from a Morgan Stanley analyst regarding "how much of the gross margin impact is due to the acceleration of moving some lines out of [the Company's] network versus the price investments," Defendant Shepherd stated: "It's primarily the price investment. I mean that has been the single biggest factor. *We aren't able to cover inflation with price, and that was by far the biggest driver*" (Emphasis added).

82.     On this news, the Company's share price suffered a single-session decline of $39.31, or 35%, from a close of $112.20 per share on May 30, 2023, to a close of $72.89 per share on May 31, 2023.

83.     That same day, *Reuters* published an article entitled "Advance Auto Parts cuts full-year profit guidance as costs weigh," which outlined the Company's reduced guidance and poor

financial results which sent "the auto parts retailer's shares down 24% before the opening bell."

84.     *CNBC* also published an article entitled "Advance Auto Parts shares plummet 35% after dismal results, cuts to outlook and dividend," which said that "some Wall Street analysts believe Advanced Auto Parts' problems could be more operational than industrywide."  Further in the article, Oppenheimer analyst, Brian Nagel, was quoted stating: "In our view, AAP issues are, likely, largely its own, and could suggest improved market share opportunities for Outperform-rated AutoZone (AZO) and O'Reilly Auto (ORLY)."

## DAMAGES TO THE COMPANY

85.     As a direct and proximate result of the Individual Defendants' conduct, the Company has and will continue to lose and expend many millions of dollars.

**Securities Class Actions**

86.     On October 9, 2023, a securities class action complaint was filed in the United States District Court for the Eastern District of North Carolina against the Company and Defendants Greco and Shepherd.  The complaint alleged violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, in the case captioned: *Suarez v. Advance Auto Parts, Inc., et al.*, Case No. 5:23-cv-563 (E.D.N.C.) ("Suarez Class Action").

87.     Then, on October 27, 2023, a second securities class action was filed in the United States Court for the Eastern District of North Carolina against the Company and Defendants Greco and Shepherd. This second securities class action alleged the same violations of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder, in the case captioned: *Watson v. Advance Auto Parts, Inc., et al.*, Case No. 5:23-cv-611 (E.D.N.C.) ("Watson Class Action").

88.     As a result of the wrongs complained of herein, the Individual Defendants have subjected the Company to the significant cost of defending itself and certain of the Company's officers.  The Company will continue to incur significant sums in relation to the Securities Class Actions and any liability or settlement that results.

**Unjust Compensation**

89.     At all relevant times, the Company paid lucrative compensation to each of the Individual Defendants.  The Company paid the Individual Defendants in connection with their respective roles as officers and/or directors of the Company, totaling over $13.6 million, as follows:

| Defendant | 2022 Total Compensation ($)[1] |
|---|---|
| Greco | 8,384,948 |
| Shepherd | 2,610,946 |
| Bailo | 265,000 |
| Ferraro | 290,000 |
| Hilson | 306,667 |
| Jones | 285,000 |
| Lee | 465,000 |
| Pertz | 265,000 |
| Torres | 265,000 |
| Valdez | 265,000 |
| Travis | 280,000 |
| **TOTAL** | **$13,682,561** |

90.     Accordingly, as part of their respective roles, the Individual Defendants were required to, among other things, exercise due care and diligence in the management and administration of the affairs of the Company, act ethically and in compliance with all laws and regulations, maintain adequate internal controls, and conduct business in a fair and transparent

---

[1]     Consists of Salary, Cash Fees, Bonus, Stock Awards, Option Awards, Non-Equity Incentive Plan Compensation, and other forms of compensation as disclosed in the Company's 2023 Proxy Statement.

manner.  Further, each of the Individual Defendants had additional duties and responsibilities owed to the Company by virtue of their executive, directorial and/or committee roles, as described *supra*, for which they were compensated for.

91.     However, the Individual Defendants failed to carry out their duties adequately or at all, causing harm to the Company, as alleged herein.  Because the Individual Defendants failed to carry out their respective duties, the compensation they received during the Relevant Period was excessive and undeserved.  As such, the Individual Defendants were unjustly enriched to the detriment of the Company.

**Insider Trading**

92.     Defendants Greco, Shepherd, and Pellicciotti, as senior executive officers of the Company, had access to material, non-public information about the Company and sold Company stock on the basis of such material, non-public information.

93.     As a result of the above false and misleading statements, the Company's share price was artificially inflated. Defendants Greco, Shepherd, and Pellicciotti each capitalized on the Company's artificially inflated stock price by selling substantial amounts of Company stock, reaping gross proceeds in excess of $2.8 million, and avoiding losses in excess of $1.3 million, as follows:[2]

| Defendant | Date | Shares Sold | Share Price ($) | Gross Proceeds ($) | Losses Avoided ($)[3] |
|-----------|------|-------------|-----------------|--------------------|-----------------------|
| Greco | 02/28/2023 | 1,193 | 144.96 | 172,937 | 85,979 |
| | 03/02/2023 | 15,961 | 139.21 | 2,221,931 | 1,058,534 |
| | 03/02/2023 | 1,849 | 139.21 | 257,399 | 122,625 |
| | 03/08/2023 | 1,267 | 132.21 | 167,510 | 75,158 |

---

[2]     Figures are based upon the information contained in the respective Form 4's filed with the SEC and rounded to the nearest whole dollar.

[3]     During this time, the Company's stock was only worth $72.89 per share, the price at closing on May 31, 2023. Amounts are rounded to the nearest whole dollar.

| Defendant | Date | Shares Sold | Share Price ($) | Gross Proceeds ($) | Losses Avoided ($)[3] |
|---|---|---|---|---|---|
| **Greco Total** | | **20,270** | **-** | **2,819,777** | **1,342,294** |
| Pellicciotti | 02/28/2023 | 49 | 144.96 | 7,103 | 3,531 |
| **Pellicciotti Total** | | **49** | **-** | **7,103** | **3,531** |
| Shepherd | 02/28/2023 | 240 | 144.96 | 34,790 | 17,296 |
| | 03/08/2023 | 211 | 132.21 | 27,896 | 12,516 |
| **Shepherd Total** | | **451** | **-** | **62,686** | **29,813** |
| | | | | | |
| **COMBINED TOTAL** | | **20,770** | **-** | **2,889,566** | **1,375,641** |

**Additional Damage to the Company**

94.     In addition to the damages specified above, the Company will also suffer further losses in relation to any internal investigations and amounts paid to lawyers, accountants, and investigators in connection thereto.

95.     The Company will also suffer losses in relation to the Company's failure to maintain adequate internal controls; including the expense involved with implementing and maintaining improved internal controls.

96.     As a direct and proximate result of Defendants' conduct, the Company has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and Defendants' breaches of fiduciary duties and misconduct as alleged herein.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

97.     Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of Individual Defendants' violations of the law, and their breaches of fiduciary duties, waste of corporate assets, and other wrongful conduct as alleged herein.

98.     Plaintiffs are current owners of Advance Auto Parts securities and have owned Advance Auto Parts stock at all relevant times hereto.  Plaintiffs understand their obligation to

hold Advance Auto Parts stock throughout the pendency of this action and are prepared to do so.

99.  Plaintiffs will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

100.  Because of the facts set forth herein, Plaintiffs have not made a demand on the Board to institute this action against the Individual Defendants. Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

101.  At the time this suit was filed, the Board was comprised of nine (9) members – the Current Directors, as defined *supra*. Thus, Plaintiffs are required to show that a majority of the Board, *i.e.*, five (5), could not exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

102.  Each of the Director Defendants[4] face a likelihood of liability in this action because they caused and/or permitted the Company to make false and misleading statements and omissions concerning the information described herein. Because of their advisory, managerial, and directorial positions within the Company, the Director Defendants had knowledge of material, non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

103.  The Director Defendants either knew or should have known of the false and misleading statements and omissions that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

---

[4]  The term "Director Defendants" in this section does not refer to Defendant Travis as he ceased to be a Company director in May 2023.

104. The Current Directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. For the reasons that follow, and for reasons detailed elsewhere in this Complaint, Plaintiffs did not make (and was excused from making) a pre-filing demand on the Board to initiate this action because making a demand would have been a futile and useless act.

105. Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and, with gross negligence, disregarded the wrongs complained of herein and are therefore not disinterested parties.

106. Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements and omissions, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

107. Additionally, each of the Current Directors received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

**Defendant Bailo**

108. Defendant Bailo has served as a Company director since 2020. As a director, Defendant Bailo was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated

in a diligent, honest, and prudent manner. Despite this, Defendant Bailo failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

109.    As a trusted Company director, Defendant Bailo conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets.

110.    Defendant Bailo serves as a member of the Audit Committee, thus had greater responsibilities by virtue thereof. Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia*, (i) overseeing the integrity of the Company's financial statements, reporting processes, and internal controls, (ii) legal and regulatory compliance, and (iii) otherwise meeting their responsibilities set out in the Audit Committee Charter, as set forth herein. Despite this, Defendant Bailo failed to fulfil these additional duties by allowing the false and misleading statements to be made and also by not correcting them. Therefore, Defendant Bailo faces a substantial likelihood of liability for her breach of fiduciary duties and any demand upon her is futile.

111.    Additionally, in connection with her role as a Company director, Defendant Bailo receives substantial income. In 2022, Defendant Bailo received a total compensation package of $265,000. With such lucrative compensation, Defendant Bailo cannot reasonably and objectively consider a demand to sue the Board who control her continued compensation, including herself.

112.    In addition, Defendant Bailo signed, and thus personally made the false and misleading statements contained in the 2022 10-K. For this reason, Defendant Bailo breached her fiduciary duties and faces and substantial likelihood of liability therefor.

113.    Defendant Bailo also solicited the 2023 Proxy Statement containing the false and

misleading statements and was re-elected to the Board as a result. Consequently, Defendant Bailo breached her fiduciary duties and faces a substantial likelihood of liability therefor.

114. Defendant Bailo is neither independent nor disinterested. Any demand upon Defendant Bailo is futile and, thus, excused.

**Defendant Ferraro**

115. Defendant Ferraro has served as a Company director since 2015. As a director, Defendant Ferraro was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Ferraro failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

116. As a trusted Company director, Defendant Ferraro conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

117. Defendant Ferraro serves as the Chair of the Audit Committee, thus had greater responsibilities by virtue thereof. Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia*, (i) overseeing the integrity of the Company's financial statements, reporting processes, and internal controls, (ii) legal and regulatory compliance, and (iii) otherwise meeting their responsibilities set out in the Audit

Committee Charter, as set forth herein. Despite this, Defendant Ferraro failed to fulfil these additional duties by allowing the false and misleading statements to be made and also by not correcting them. Therefore, Defendant Ferraro faces a substantial likelihood of liability for his breach of fiduciary duties and any demand upon him is futile.

118.    Additionally, in connection with his role as a Company director, Defendant Ferraro receives substantial income. In 2022, Defendant Ferraro received a total compensation package of $290,000. With such lucrative compensation, Defendant Ferraro cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

119.    In addition, Defendant Ferraro signed, and thus personally made the false and misleading statements contained in the 2022 10-K.  For this reason, Defendant Ferraro breached his fiduciary duties and faces and substantial likelihood of liability therefor.

120.    Defendant Ferraro also solicited the 2023 Proxy Statement containing the false and misleading statements and was re-elected to the Board as a result. Consequently, Defendant Ferraro breached his fiduciary duties and faces a substantial likelihood of liability therefor.

121.    Defendant Ferraro is neither independent nor disinterested. Any demand upon Defendant Ferraro is futile and, thus, excused.

**<u>Defendant Hilson</u>**

122.    Defendant Hilson has served as a Company director since March 2022. As a director, Defendant Hilson was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries,

and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Hilson failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

123.     As a trusted Company director, Defendant Hilson conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets.

124.     Defendant Hilson serves as a member of the Audit Committee, thus had greater responsibilities by virtue thereof.  Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia*, (i) overseeing the integrity of the Company's financial statements, reporting processes, and internal controls, (ii) legal and regulatory compliance, and (iii) otherwise meeting their responsibilities set out in the Audit Committee Charter, as set forth herein. Despite this, Defendant Hilson failed to fulfil these additional duties by allowing the false and misleading statements to be made and also by not correcting them. Therefore, Defendant Hilson faces a substantial likelihood of liability for her breach of fiduciary duties and any demand upon her is futile.

125.     Additionally, in connection with her role as a Company director, Defendant Hilson receives substantial income.  In 2022, Defendant Hilson received a total compensation package of $306,667. With such lucrative compensation, Defendant Hilson cannot reasonably and objectively consider a demand to sue the Board who control her continued compensation, including herself.

126.     In addition, Defendant Hilson signed, and thus personally made the false and misleading statements contained in the 2022 10-K. For this reason, Defendant Hilson breached her

fiduciary duties and faces and substantial likelihood of liability therefor.

127. Defendant Hilson also solicited the 2023 Proxy Statement containing the false and misleading statements and was re-elected to the Board as a result. Consequently, Defendant Hilson breached her fiduciary duties and faces a substantial likelihood of liability therefor.

128. Defendant Hilson is neither independent nor disinterested. Any demand upon Defendant Hilson is futile and, thus, excused.

**Defendant Jones**

129. Defendant Jones has served as a Company director since 2019. As a director, Defendant Jones was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Jones failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

130. As a trusted Company director, Defendant Jones conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

131. Additionally, in connection with his role as a Company director, Defendant Jones receives substantial income. In 2022, Defendant Jones received a total compensation package of $285,000. With such lucrative compensation, Defendant Jones cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

132. In addition, Defendant Jones signed, and thus personally made the false and misleading statements contained in the 2022 10-K. For this reason, Defendant Jones breached his fiduciary duties and faces and substantial likelihood of liability therefor.

133. Defendant Jones also solicited the 2023 Proxy Statement containing the false and misleading statements and was re-elected to the Board as a result. Consequently, Defendant Jones breached his fiduciary duties and faces a substantial likelihood of liability therefor.

134. Defendant Jones also has a longstanding business relationship with Defendant Valdez, stemming from at least March 2016, thus compromising their independence from one another. In particular, Defendant Jones served as Executive Vice President and Chief Marketing Officer of Target from 2012 through September 2016. At the same time, Defendant Valdez served as Executive Vice President, Chief Supply Chain & Logistics Officer at Target from March 2016 through to 2022. Thus, from March 2016 through to September 2016, Defendants Jones and Valdez worked together as senior executives and built a professional relationship while at Target. As a result of the foregoing, Defendants Jones and Valdez are incapable of impartially considering a demand to sue each other.

135. Defendant Jones is neither independent nor disinterested. Any demand upon Defendant Jones is futile and, thus, excused.

**Defendant Lee**

136. Defendant Lee has served as a Company director since 2015. As a director, Defendant Lee was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take

steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Lee failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

137. As Chairman of the Board and a trusted Company director, Defendant Lee conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

138. Additionally, in connection with his role as a Company director, Defendant Lee receives substantial income. In 2022, Defendant Lee received a total compensation package of $465,000. With such lucrative compensation, Defendant Lee cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

139. In addition, Defendant Lee signed, and thus personally made the false and misleading statements contained in the 2022 10-K. For this reason, Defendant Lee breached his fiduciary duties and faces and substantial likelihood of liability therefor.

140. Defendant Lee also solicited the 2023 Proxy Statement containing the false and misleading statements and was re-elected to the Board as a result. Consequently, Defendant Lee breached his fiduciary duties and faces a substantial likelihood of liability therefor.

141. Defendant Lee is neither independent nor disinterested. Any demand upon Defendant Lee is futile and, thus, excused.

**Defendant Pertz**

142. Defendant Pertz has served as a Company director since 2018. As a director, Defendant Pertz was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors

and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Pertz failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

143.     As a trusted Company director, Defendant Pertz conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

144.     Additionally, in connection with his role as a Company director, Defendant Pertz receives substantial income. In 2022, Defendant Pertz received a total compensation package of $265,000. With such lucrative compensation, Defendant Pertz cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

145.     In addition, Defendant Pertz signed, and thus personally made the false and misleading statements contained in the 2022 10-K. For this reason, Defendant Pertz breached his fiduciary duties and faces and substantial likelihood of liability therefor.

146.     Defendant Pertz also solicited the 2023 Proxy Statement containing the false and misleading statements and was re-elected to the Board as a result. Consequently, Defendant Pertz breached his fiduciary duties and faces a substantial likelihood of liability therefor.

147.     Defendant Pertz is neither independent nor disinterested. Any demand upon Defendant Pertz is futile and, thus, excused.

**Defendant Torres**

148.     Defendant Torres has served as a Company director since 2021. As a director,

Defendant Torres was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Torres failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

149.    As a trusted Company director, Defendant Torres conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets.

150.    Additionally, in connection with her role as a Company director, Defendant Torres receives substantial income. In 2022, Defendant Torres received a total compensation package of $265,000. With such lucrative compensation, Defendant Torres cannot reasonably and objectively consider a demand to sue the Board who control her continued compensation, including herself.

151.    In addition, Defendant Torres signed, and thus personally made the false and misleading statements contained in the 2022 10-K.  For this reason, Defendant Torres breached her fiduciary duties and faces and substantial likelihood of liability therefor.

152.    Defendant Torres also solicited the 2023 Proxy Statement containing the false and misleading statements and was re-elected to the Board as a result. Consequently, Defendant Torres breached her fiduciary duties and faces a substantial likelihood of liability therefor.

153.    Defendant Torres is neither independent nor disinterested. Any demand upon Defendant Torres is futile and, thus, excused.

**Defendant Valdez**

154.     Defendant Valdez has served as a Company director since 2020. As a director, Defendant Valdez was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Valdez failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

155.     As a trusted Company director, Defendant Valdez conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

156.     Defendant Valdez serves as a member of the Audit Committee, thus had greater responsibilities by virtue thereof.  Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia*, (i) overseeing the integrity of the Company's financial statements, reporting processes, and internal controls, (ii) legal and regulatory compliance, and (iii) otherwise meeting their responsibilities set out in the Audit Committee Charter, as set forth herein. Despite this, Defendant Valdez failed to fulfil these additional duties by allowing the false and misleading statements to be made and also by not correcting them. Therefore, Defendant Valdez faces a substantial likelihood of liability for his breach of fiduciary duties and any demand upon him is futile.

157. Additionally, in connection with his role as a Company director, Defendant Valdez receives substantial income. In 2022, Defendant Valdez received a total compensation package of $265,000. With such lucrative compensation, Defendant Valdez cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

158. In addition, Defendant Valdez signed, and thus personally made the false and misleading statements contained in the 2022 10-K. For this reason, Defendant Valdez breached his fiduciary duties and faces and substantial likelihood of liability therefor.

159. Defendant Valdez also solicited the 2023 Proxy Statement containing the false and misleading statements and was re-elected to the Board as a result. Consequently, Defendant Valdez breached his fiduciary duties and faces a substantial likelihood of liability therefor.

160. Defendant Valdez also has a longstanding business relationship with Defendant Jones, stemming from at least March 2016, thus compromising their independence from one another. In particular, Defendant Valdez served as Executive Vice President, Chief Supply Chain & Logistics Officer at Target from March 2016 through to 2022. At the same time, Defendant Jones served as Executive Vice President and Chief Marketing Officer of Target from 2012 through September 2016. Thus, from March 2016 through to September 2016, Defendants Valdez and Jones worked together as senior executives and built a professional relationship while at Target. As a result of the foregoing, Defendants Valdez and Jones are incapable of impartially considering a demand to sue each other.

161. Defendant Valdez is neither independent nor disinterested. Any demand upon Defendant Valdez is futile and, thus, excused.

**Non-Party O'Kelly**

162. Non-Party O'Kelly is neither disinterested nor independent, and therefore, is

incapable of considering demand because he (as its president and CEO) is an employee of the Company who derives substantially all of his income from his employment with Advance Auto Parts, making him not independent. As such, Non-Party O'Kelly cannot independently consider any demand to sue himself for breaching his fiduciary duties to Advance Auto Parts, because that would expose him to liability and threaten his livelihood.

163.    As CEO, Non-Party O'Kelly also fails the NYSE's bright-line independence test and cannot, therefore, be considered independent, as admitted by the Company on its Investor Relations website. As such, Non-Party O'Kelly could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Non-Party O'Kelly is therefore futile.

164.    In addition, Non-Party O'Kelly receives lucrative compensation in connection with his employment with Advance Auto Parts, in which he receives $1.25 million base salary, plus incentive and sign-on bonuses, and stock awards.[5] Non-Party O'Kelly is not independent from Defendants Jones, Pertz, and Torres as they comprise the Compensation Committee and are responsible for evaluating and determining the compensation of the CEO and Executive Officers, including Non-Party O'Kelly.  The purpose of the Compensation Committee is to assist the Board in discharging its responsibilities related to the compensation provided by the Company to its CEO and Executive Officers.  Because of his status as an inside director, and the concomitant substantial compensation he receives, Non-Party O'Kelly could not consider a demand adverse to the other Director Defendants serving on the Compensation Committee who are responsible for his financial future.

---

[5]    *See* Employment Agreement Between Advance Auto Parts and Shaun O'Kelly, attached as Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the SEC on August 18, 2023.

165.    Non-Party O'Kelly is neither independent nor disinterested. Any demand upon Non-Party O'Kelly is futile and, thus, excused.

**Additional Reasons Demand is Excused**

166.    The Company has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Current Directors have not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

167.    The Company, at all material times, had its Code of Conduct and related corporate governance policies which required each of the Individual Defendants to maintain the highest standards of honesty and integrity, particularly in relation to accurate and truthful public disclosures. Yet, despite this Code of Conduct, and other relevant policies and committee charters, each of the Director Defendants failed to ensure that the Company upheld high standards of integrity, misrepresented facts to the investing public, and failed to report any concerns, or investigate any misconduct, let alone commence litigation against the Individual Defendants.

168.    In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust enrichment. In violation of the Code of Conduct, the Director Defendants failed to comply with laws and regulations, failed to maintain the accuracy of company records, public reports, and communications, and failed to uphold the responsibilities related thereto. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile

as to them.

169.   The Current Directors received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have benefitted from the wrongs alleged herein and have engaged therein to preserve their positions of control and the prerequisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

170.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

171.   Publicly traded companies, such as Advance Auto Parts, typically carry director and officer liability insurance from which the Company could potentially recover some or all of its losses.  However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover the Company's damages. If no such insurance is carried, then the Current Directors will not cause the Company to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event.

172.   Accordingly, each of the Current Directors, and at least a majority of them, cannot reasonably consider a demand with the requisite disinterestedness and independence. Indeed, any

demand upon the Current Directors is futile and, thus, excused.

## CLAIMS FOR RELIEF

## COUNT I

## (Against the Individual Defendants for Breach of Fiduciary Duty)

173. Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

174. The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

175. The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

176. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

177. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

178. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending and/or settling securities lawsuits and governmental investigations, severe damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

## COUNT II

### (Against the Individual Defendants for Waste of Corporate Assets)

179.    Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

180.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and ongoing harm to the Company.

181.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (a) paying excessive compensation, bonuses, and termination payments to certain of its executive officers, as detailed, *supra*; (b) awarding self-interested stock options to certain officers and directors; and (c) incurring potentially millions of dollars of legal liability and/or legal costs to defend and/or settle the Securities Class Action, addressing the Individual Defendants' unlawful action.

182.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

## COUNT III

### (Against the Individual Defendants for Unjust Enrichment)

183.    Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

184.    As a result of their wrongful conduct, violations of law, and false and misleading statements, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, the Company.

185.    The Individual Defendants, by virtue of their positions as directors and officers of

the Company, received financial compensation, stock awards, and other benefits, as detailed *supra*, which was unjust in light of the Individual Defendant's bad faith conduct and is thus against equity and good conscience to permit the Individual Defendants to retain.

186.    Plaintiffs, as shareholders and representative of Advance Auto Parts, seek restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from benefits, insider trading, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

## COUNT IV

### (Against the Individual Defendants for Gross Mismanagement)

187.    Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

188.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Advance Auto Parts in a manner consistent with the operations of a publicly held corporation.

189.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of fiduciary duty alleged herein, Advance Auto Parts has sustained and will continue to sustain significant damages.

190.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

## COUNT V

### (Against Defendants Greco, Shepherd, and Pellicciotti for Insider Trading)

191.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

192.    By reason of their fiduciary role as officers and directors of the Company, Defendants Greco, Shepherd, and Pellicciotti specifically owed the Company the highest obligation of due care, good faith, and loyalty.

193.    As officers and directors of the Company, Defendants Greco, Shepherd, and Pellicciotti were given access to material information about the Company, as described above, which was not generally available to the public.

194.    When Defendants Greco, Shepherd, and Pellicciotti sold their Company stock, as detailed *supra*, they were in possession of material, non-public information described above, and sold Company stock on the basis of such information.

195.    The information described above was proprietary, non-public information concerning the Company's business operations and financial condition.  It was a proprietary asset belonging to the Company, which Defendants Greco, Shepherd, and Pellicciotti misappropriated to their own benefit when they sold holdings in Company stock.  Defendants Greco, Shepherd, and Pellicciotti knew that this information was not intended to be available to the public.  Had such information been generally available to the public, it would have significantly reduced the market price of Company stock.

196.    As the use of the Company's proprietary information for their own gain constitutes a breach of Defendants Greco, Shepherd, and Pellicciotti's fiduciary duties, the Company is entitled to disgorge any illegal profits obtained thereby.

**COUNT VI**

**(Against Defendants Greco and Shepherd for Contribution Under
Sections 10(b) and 21D of the Securities Exchange Act of 1934)**

197. Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

198. The Company, along with Defendants Greco and Shepherd, are named as defendants in the Securities Class Actions (defined above), which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.

199. The Securities Class Actions each allege that the class members relied, directly or indirectly, upon the false and misleading statements and omissions, as alleged herein, in purchasing Acadia securities. The Securities Class Actions further allege that, as a direct and proximate result, the class members suffered damages because the value of their investments were artificially inflated by the false and misleading statements and omissions, they purchased such securities at the artificially inflated prices, and the value of their investments fell when the truth was eventually revealed, causing economic losses to the class members.

200. If and when the Company is found liable in the Securities Class Actions for these violations of the federal securities laws, the Company's liability will be in whole or in part due to the Defendants Greco and Shepherd's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

201. Defendants Greco and Shepherd, because of their positions of control and authority as senior executive officers of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Actions.

202. Accordingly, Defendants Greco and Shepherd are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15

U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

203.    As such, the Company is entitled to receive all appropriate contribution or indemnification from Defendants Greco and Shepherd.

**COUNT VII**

**(Against the Proxy Defendants for Violations of
Section 14(a) of the Securities Exchange Act of 1934)**

204.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

205.    Defendants Bailo, Ferraro, Greco, Hilson, Jones, Lee, Pertz, Torres, Valdez, and Travis (the "Proxy Defendants") solicited the 2023 Proxy Statement containing materially false and misleading statements and/or omissions.

206.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

207.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

208.    Under the direction and watch of the Proxy Defendants, the 2023 Proxy Statement, among other things: (i) omitted and/or concealed the negative impacts of the pricing initiative; and (ii) provided investors with an overly optimistic perception of Advance Auto Parts' operations.

209.    The Proxy Defendants also caused the 2023 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, while failing to disclose that the Company's business, financial, and operational prospects were misrepresented as a result of false and misleading statements, causing the Company's share price to be artificially inflated and allowing the Proxy Defendants to wrongfully benefit from the unlawful and fraudulent conduct alleged herein.

210.    Moreover, the 2023 Proxy Statement was false and misleading when it discussed the Company's "strong corporate governance" and adherence to specific governance policies and procedures, including the Code of Conduct, due to the Individual Defendants' failures to abide by them and their causing the Company to engage in improper practices and issue false and misleading statements and/or omissions of material fact.

211.    In the exercise of reasonable care, the Proxy Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiffs in voting on the matters set forth for shareholder determination in the 2023 Proxy Statement, including but not limited to, election of directors and approval of executive compensation.

212.    The misrepresentations and omissions set forth herein were material to shareholders in voting on the proposals in the 2023 Proxy Statement who would not have approved, *inter alia*: (i) the re-election of Defendants Bailo, Ferraro, Greco, Hilson, Jones, Lee, Pertz, Torres, and

Valdez to the Board; (ii) the 2023 Omnibus Incentive Compensation Plan; (iii) the 2023 Employee Stock Purchase Plan; and (iv) the compensation of the Company's executive officers.

213. As a result of the Proxy Defendants causing the 2023 Proxy Statement to be false and misleading, Company shareholders approved the proposals set forth therein, including, *inter alia*: (i) the re-election of Defendants Bailo, Ferraro, Greco, Hilson, Jones, Lee, Pertz, Torres, and Valdez to the Board of Directors; (ii) the 2023 Omnibus Incentive Compensation Plan; (iii) the 2023 Employee Stock Purchase Plan; and (iv) the compensation of the Company's executive officers.

214. The Company was damaged as a result of the Proxy Defendants' material misrepresentations and omissions in the 2023 Proxy Statement.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

(A) Declaring that Plaintiffs may maintain this action on behalf of the Company and that Plaintiffs are adequate representatives of the Company;

(B) Finding the Individual Defendants liable for breaching their fiduciary duties owed to the Company, waste of corporate assets, unjust enrichment, and gross mismanagement;

(C) Against Defendants Greco, Shepherd, and Pellicciotti for the amount of damages sustained by the Company as a result of their insider trading;

(D) Against the Proxy Defendants for violations of Section 14(a) of the Securities Exchange Act of 1934;

(E) Against Defendants Greco and Shepherd in favor of the Company for contribution under Sections 10(b) and 21D of the Securities Exchange Act of 1934;

(F)     Directing the Individual Defendants to take all necessary actions to reform and improve the Company's corporate governance, risk management, and internal operating procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the rampant wrongful conduct described herein;

(G)     Awarding damages to the Company for the harm the Company suffered as a result of the Individual Defendants' wrongful conduct;

(H)     Awarding Plaintiffs the costs and disbursements of this action, including attorneys', accountants', and experts' fees; and

(I)     Awarding such other and further relief as is just and equitable.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: January 17, 2024

/s/ Paul R. Dickinson, Jr.
**LAW OFFICES OF JAMES SCOTT FARRIN**
Paul R. Dickinson, Jr.
NC Bar No.: 20510
555 S. Mangum St.; Ste. 800
Durham, NC 27701
T: 919-688-4991
F: 919-688-4468
E: pdickinson@farrin.com


**GAINEY McKENNA & EGLESTON**
Gregory M. Egleston (*pending pro hac vice*)
501 Fifth Avenue, 19th Fl.
New York, NY 10017
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: gegleston@gme-law.com

*Attorneys for Plaintiffs*

## VERIFICATION

I, BRAXTON HOLDER, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of Advance Auto Parts, Inc. and authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of Advance Auto Parts, Inc. common stock at all relevant times.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

BRAXTON HOLDER

## <u>VERIFICATION</u>

I, EDWARD L. WEAVER, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of Advance Auto Parts, Inc. and authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of Advance Auto Parts, Inc. common stock at all relevant times.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Edward L Weaver
EDWARD L. WEAVER